[No. B229880. Second Dist., Div. Three. June 28, 2011.]

FIREMAN'S FUND INSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FRONT GATE PLAZA, LLC, et al., Real Parties in Interest.

## COUNSEL

Akin Gump Strauss Hauer & Feld, Rex S. Heinke, L. Rachel Helyar, Shawn Hanson and Maria Ellinikos for Petitioners.

Greines, Martin, Stein & Richland, Robin Meadow, Robert A. Olson, Cynthia E. Tobisman and Jeffrey E. Raskin for Los Angeles County Bar Association, Beverly Hills Bar Association and Association of Southern California Defense Counsel as Amici Curiae on behalf of Petitioners.

Christine Burdick for Santa Clara County Bar Association as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Silver & Freedman and Lane E. Bender for Real Parties in Interest Front Gate Plaza, Raymond Arjmand, Primero Management, Inc., and R & A Associates, Inc.

Shernoff Bidart Echeverria, Evangeline F. Grossman; Smythe Law Group, Inc., Michelle J. Smythe; Valerie F. Horn & Associates and Valerie F. Horn for Real Party in Interest Front Gate Plaza.

## OPINION

**CROSKEY, J.**—The petitioners, Fireman's Fund Insurance Company and National Surety Corporation (hereinafter, collectively, Fireman's Fund), seek a writ of mandate vacating the trial court's order of November 18, 2010, which required an attorney, who was a member of a law firm that had formerly represented Fireman's Fund in this litigation, to answer at her deposition five questions to which objections of attorney-client privilege and/or work product privilege had been asserted. In overruling these objections, the trial court generally held that (1) the attorney-client privilege applies only to communications directly between an attorney and his or her client, but does not extend to communications among and between multiple counsel (or other reasonably necessary parties) who are representing the client and (2) the absolute work product privilege applies only to an attorney's work product that has been reduced to written form.

As we explain, the trial court's ruling improperly restricted the scope of these two privileges. We will therefore grant the petition and remand with directions.

### FACTUAL AND PROCEDURAL BACKGROUND

Front Gate Plaza, LLC (hereinafter Front Gate), owns and operates a shopping mall in Lancaster, California. Primero Management, Inc. (Primero), provides management and accounting services for Front Gate. Raymond Arjmand, either individually or as trustee for the Arjmand Family Trust (Arjmand), is a managing member of Front Gate and the principal of Primero. Primero apparently provides management and accounting services not just for Front Gate, but for other Arjmand-owned entities as well.

In April of 2008,[1] Front Gate filed this action against Fireman's Fund alleging, among other things, bad faith in the handling of certain property damage claims that had allegedly been sustained by Front Gate on July 20,

---

[1] The operative first amended complaint was filed on October 1, 2008.

2006, as the result of wind- and rainstorms. Front Gate claimed that Fireman's Fund had conducted an improper investigation and evaluation of the claims and, as a result, monetary benefits due under Fireman's Fund's policy were unreasonably delayed or denied.

In May of 2009, Fireman's Fund's counsel, Carlson, Calladine & Peterson LLP (CCP), was contacted by Sunil Chand (Chand), the acting director of accounting for Primero, who claimed to be a whistleblower in possession of evidence demonstrating that Front Gate's insurance claims were fraudulent. Chand spoke with Attorney Melissa Dubbs, an associate at CCP. Chand initially made several calls to Dubbs without disclosing his name. Dubbs referred Chand to Pamela Pierce (Pierce), an investigator retained by CCP, who traced Chand's calls and discovered his identity.

According to Chand, he had discovered, while working at Primero, that his employer was engaging in financial and accounting irregularities with respect to Front Gate and another Arjmand entity, not a party to these proceedings. According to Chand, Front Gate sought insurance compensation for expenses which did not arise from covered events, submitted inflated repair bids from vendors who were part of Arjmand's scheme, and split insurance proceeds with the vendors who had submitted the inflated bids. Chand was fired by Arjmand on June 2, 2009, shortly after he informed Arjmand that he had filed amended 1099 forms for certain vendors and asserted that he no longer wished to be a party to Arjmand's fraud.[2] According to Front Gate, Chand was a vindictive former employee who had lied on his resume, saw conspiracies where none existed, and had a history of making baseless accusations against prior employers.

On or about June 7, 2009, Chand met with Dubbs and investigator Pierce in CCP's office in San Francisco. He brought with him and delivered documents that he had copied from Primero's records. At the request of Dubbs, CCP partner Donald Carlson wrote a check to Chand for $1,000 to reimburse him for his time and travel expense in coming from Los Angeles to San Francisco.[3]

---

[2] Chand also reported his discoveries to both the Internal Revenue Service and the Federal Bureau of Investigation by letters dated May 29, 2009.

[3] Chand later provided CCP with additional documents and a flash drive that he contended further evidenced fraud (Chand delivered a total of over 5,000 pages of documents, in addition to the flash drive), and CCP reimbursed Chand for additional expenses and lost time. Front Gate claims that these documents were stolen and that Fireman's Fund had reason to know such fact when it received them from Chand. Nonetheless, Fireman's Fund claims that these documents prove a conspiracy to commit, and the commission of, acts of insurance fraud. Fireman's Fund further claims that, under the Insurance Fraud Prevention Act (IFPA) and related regulations, it was required to retain such documents and to conduct an investigation of

In August 2009, CCP attorney Robert Peterson advised Front Gate's counsel that CCP had received 5,450 pages of documents "which, in our opinion, constitute evidence of a criminal conspiracy and crimes on the part of your clients." Peterson demanded that Front Gate produce the documents described by Chand because they were responsive to Fireman's Fund's discovery requests.

In September 2009, Fireman's Fund filed a cross-complaint against Front Gate, Primero, Arjmand and others,[4] alleging that Front Gate had submitted fraudulent claims to Fireman's Fund and had conspired with others to commit insurance fraud. Fireman's Fund's motion for leave to file the cross-complaint was supported, in part, by a declaration from Chand, which had been drafted by Attorney Peterson.

The parties became embroiled in protracted discovery disputes over the so-called "Chand documents/incident" because real parties in interest refused to produce copies of the documents that Chand had provided to CCP and sought to preclude Fireman's Fund from using these documents in this litigation. On November 6, 2009, at Fireman's Fund's request, the trial court designated retired Los Angeles Superior Court Judge Arnold Gold (hereinafter, the Referee) to assist the court with "issues raised by the Chand documents incident." Specifically, the court authorized the Referee to "hear, determine and make recommendations" as to: "(1) All discovery and evidentiary issues and the use of the Chand documents in the litigation, (2) whether defendants had violated their ethical and legal duties, and (3) whether plaintiffs or any other party or attorney had violated their legal or ethical duties by suppressing or withholding documents or evidence in previous responses to defendant's discovery request."

The dispute at issue in this writ proceeding surrounds certain questions propounded at the deposition of Attorney Dubbs.[5] We note that, at the first session of her deposition, in response to Fireman's Fund's assertion of the

Chand's allegations and the documents he produced. (Ins. Code, §§ 1875.20, 1875.21; Cal. Code Regs., tit. 10, § 2698.30 et seq.)

[4] Front Gate, Primero, Arjmand and cross-defendant R&A Associates, an alleged ficticious business name for Arjmand, are the real parties in interest in this case. In addition to the real parties in interest, Fireman's Fund also named as cross-defendants several vendors and adjusters allegedly involved in Arjmand's scheme to defraud Fireman's Fund: Poly Help Construction, Inc.; Jeff Davani, individually and doing business as Poly Help; Robert Barton; and Bob Barton Adjusting Inc., doing business as Bob Barton Consulting.

[5] Initially, the parties disputed whether real parties in interest had satisfied the test for taking the deposition of opposing counsel set out in *Spectra-Physics, Inc. v. Superior Court* (1988) 198 Cal.App.3d 1487 [244 Cal.Rptr. 258]. The Referee permitted the deposition to go forward. In Fireman's Fund's writ petition, it argues that Dubbs's deposition should not be resumed as the *Spectra-Physics* test has not been satisfied with respect to her. As we resolve the writ petition

attorney-client and work product privileges,[6] it was argued that the crime-fraud exception applied, based on Chand's alleged *theft* of the documents. A hearing was held, and the Referee determined that the crime-fraud exception did not apply. That ruling is not at issue in this proceeding.

Thereafter, real parties in interest requested, in September of 2010, that the Referee compel Attorney Dubbs to answer 10 specific questions to which Fireman's Fund had previously objected on privilege grounds. On October 3, 2010, the Referee issued his fourth report and recommendation (Fourth Report) recommending that Dubbs be compelled to answer all 10 questions. Fireman's Fund then agreed to let her answer five of those questions. (Questions 1, 2, 3, 4 and 8.) With respect to the remaining five questions (questions 5, 6, 7, 9 and 10), however, Fireman's Fund argued that the attorney client and/or the *absolute* work product privileges (Code Civ. Proc., § 2018.030, subd. (a))[7] applied and she could not be compelled to answer them. Over Fireman's Fund's objections, the trial court approved the Referee's recommendation and, on November 18, 2010, ordered that Dubbs answer the following five questions (and "reasonable follow-up questions seeking non-privileged information"):

(5) Q: "Do you know how Mr. Peterson drafted the declaration of Mr. Chand without meeting with Mr. Chand?"[8]

A: "I think I know."

Q: "And what is it?"[9]

---

on the basis of the attorney-client and work product privileges, we need not reach the issue. It may be fully addressed and developed on remand.

[6] On May 10, 2010, shortly after the trial court approved the Referee's order that Attorney Dubbs be deposed, Fireman's Fund associated Akin Gump Hauer & Feld LLP (Akin) as cocounsel for Fireman's Fund. Subsequently, in November 2010, Akin replaced CCP as Fireman's Fund's counsel.

[7] Unless otherwise expressly stated, all statutory references are to the Code of Civil Procedure.

Section 2018.030 provides: "(a) A *writing* that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable *under any circumstances*. [¶] (b) The work product of an attorney, *other than a writing described in subdivision (a)*, is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Italics added.)

[8] Standing alone, the question gives the impression that Attorney Peterson drafted the Chand declaration without ever having met Chand. Dubbs repeatedly testified to a meeting between Peterson and Chand on June 29, 2009. Dubbs also testified that Chand came to the office on July 20, 2009, to discuss his declaration with Attorney Peterson and sign it.

[9] The Referee initially recommended that Dubbs be ordered to indicate whether a basis for thinking she knew how Peterson drafted the declaration is a *written* communication among

(6) Q: "What did you tell Mr. Carlson in order for him to write a personal check to Mr. Chand?"

(7) Q: "Was Pamela Pierce aware that Sunil Chand was paid $1,000 on your initial meeting with Mr. Chand?"

A: "Yes. . . . She was aware of it because she and I had a discussion about how to—how to pay Mr. Chand—how to pay Mr. Chand $1,000."

Q: "What were those discussions?"

(9) Q: "Did you prepare any subpoenas based on any documents that Chand gave you[?]"

A: "Yes."

Q: "Which ones?"

(10) "Did you explain who Mr. Chand was to Mr. Carlson before he wrote the check?"

The Referee (and the trial court) took a very narrow and restricted view of the attorney-client privilege and the *absolute* work product privilege. The Referee expressed the view that the attorney-client privilege protects *only* communications *between* an attorney and a client, but not an attorney's communications with members or agents of her law firm about client matters. In addition, because he was of the view that the communications at issue were not reduced to writing and did not encompass an attorney's legal opinions, the Referee concluded that *only* the qualified work product privilege applied and therefore those communications should be divulged to avoid "unfair[] prejudice" to real parties in interest. As indicated, the trial court issued the recommended order on November 18, 2010.

Fireman's Fund responded with the petition for writ relief that is now before us.[10]

---

CCP attorneys and/or staff. Dubbs voluntarily answered that question in the negative. The Referee then recommended that Dubbs be ordered to provide an answer to the question itself: How did Peterson draft the declaration of Chand without meeting Chand?

[10] We are concerned with issues of *absolute* privilege and the manner in which they apply (or not) to *five* deposition questions. Were it not for the issue of whether Attorney Dubbs could be deposed at all, which we need not address in this opinion (see fn. 5, *ante*), the matter could have been presented as an issue of law on stipulated facts. Instead, the parties have presented a record of *nearly 3,000* pages. We are at a loss as to why a police report relating to Chand's departure from a previous employment, a forensic analysis of the flash drive that Chand delivered to Dubbs, and the *complete* depositions of Pierce and Chand are "necessary for a

### ISSUES PRESENTED

The pending petition for writ relief raises two very narrow and specific questions. First, is the attorney-client privilege limited to communications between an attorney and his or her client or is it broad enough to cover communications related to a client's matter or interests among and between multiple counsel (or other reasonably necessary parties) who are representing the client? Second, is the absolute work product privilege limited to matters reduced to writing or does it extend to an attorney's impressions, conclusions, opinions, legal research or theories whether or not reduced to writing?

The trial court adopted the narrower view with respect to both privileges. As we explain, this was error.

### DISCUSSION

"The appellate court may entertain a petition for extraordinary relief when compulsion to answer a discovery order would violate a privilege." (*BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1249 [245 Cal.Rptr. 682].) Discovery orders are reviewed for an abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [101 Cal.Rptr.3d 758, 219 P.3d 736].) A trial court's application of the wrong legal standard is an abuse of discretion. (*Ibid.*) In this case, the principal issue raised is whether the trial court applied the proper legal standard with respect to both the attorney-client privilege and the work product privilege. Based on this record, it is clear that it did not.

1. *The Attorney-client Privilege Is Not Limited to Communications Directly Between a Client and His or Her Attorney*

■ "[T]he fundamental purpose of the attorney-client privilege is the preservation of the confidential relationship between attorney and client [citation], and the primary harm in the discovery of privileged material is the disruption of that relationship . . . ." (*Costco Wholesale Corp. v. Superior Court, supra,* 47 Cal.4th at pp. 740–741.)

complete understanding of the case and the ruling under review." (Cal. Rules of Court, rule 8.486(b)(1)(C).) We are asked to determine whether the absolute attorney-client and/or work product privileges apply to five deposition questions propounded to Dubbs. Whether real parties in interest committed insurance fraud, whether Chand stole the documents, whether either party's counsel engaged in ethical or discovery violations, and whether Fireman's Fund may retain and use the documents are simply not at issue here. These are all matters that, to the extent they have not already been resolved, may be addressed by the Referee and the trial court upon remand.

To effectuate this purpose, the attorney-client privilege, codified at Evidence Code section 954,[11] gives a client the right "to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." Evidence Code section 952 broadly defines " 'confidential communication between client and lawyer' " as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and *includes a legal opinion formed* and the advice given by the lawyer in the course of that relationship." (Italics added.)

██  While most instances in which an assertion of the privilege is upheld involve communications between an attorney and client, the statutory language is not so narrow. As noted above, the definition of a protected "confidential communication" includes "a legal opinion formed." "In 1967, Evidence Code section 952 was amended to include within the definition of a confidential communication 'a legal opinion formed and the advice given by the lawyer in the course of that relationship.' The comment of the Law Revision Commission to the 1967 amendment makes clear the scope of the amendment. 'The express inclusion of "a legal opinion" in the last clause will preclude a possible construction of this section that would leave the attorney's uncommunicated legal opinion—which includes his impressions and conclusions—unprotected by the privilege. Such a construction would virtually destroy the privilege.' " (*Lohman v. Superior Court* (1978) 81 Cal.App.3d 90, 99 [146 Cal.Rptr. 171].) Thus, legal opinions formed by counsel during representation of the client are protected "confidential communication[s]," even if the opinions have not been transmitted to the client.

---

[11] Evidence Code, section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by: [¶] (a) The holder of the privilege; (b) A person who is authorized to claim the privilege by the holder of the privilege; or (c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure. [¶] The relationship of attorney and client shall exist between a law corporation as defined in Article 10 (commencing with Section 6160) of Chapter 4 of Division 3 of the Business and Professions Code and the persons to whom it renders professional services, as well as between such persons and members of the State Bar employed by such corporation to render services to such persons. The word 'persons' as used in this subdivision includes partnerships, corporations, limited liability companies, associations and other groups and entities."

■ Moreover, Evidence Code section 952 provides that a "confidential communication" remains such when it is disclosed "to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted." Surely, third persons to whom the information (in this case, an attorney's legal opinions) may be conveyed without destroying confidentiality include other attorneys in the law firm representing the client. Indeed, Evidence Code section 954 emphasizes that the relationship between attorney and client exists between the client and *all* attorneys employed by the retained law corporation. The Supreme Court has recognized that it is an "everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1153–1154 [86 Cal.Rptr.2d 816, 980 P.2d 371].) Such sharing cannot abrogate the privilege protecting an attorney's legal opinions.

■ The issue also arises as to whether the legal opinions may be shared with a nonattorney agent retained by the attorney to assist with the representation without losing their confidential status. It appears that they can, as such an agent would fall into the category of "those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted."

Against this framework, we now consider several of the questions asked Attorney Dubbs which are at issue in this proceeding. Questions 6 and 10 asked, "What did you tell Mr. Carlson in order for him to write a personal check to Mr. Chand?" and "Did you explain who Mr. Chand was to Mr. Carlson before he wrote the check?" Both of these questions seek information regarding Dubbs's evaluation of Chand and his possible usefulness to Fireman's Fund's case, as expressed to another attorney at CCP. In other words, they seek from Dubbs her legal opinions, which, as far as the record indicates, were expressed only to another CCP attorney. These opinions are confidential communications, which are protected by the attorney-client privilege.

Question 5 asked Dubbs how Attorney Peterson drafted Chand's declaration without speaking to Chand. This question clearly seeks privileged information, that is, Peterson's legal opinions involved in the drafting of the Chand declaration. The information does not lose its confidential characterization by being shared with Dubbs (or others at the CCP firm) and there is no indication that the information has been shared with anyone else. As such, this question sought information subject to the attorney-client privilege, and an answer should not have been compelled.

Question 7 asked Dubbs to disclose her "discussions" with investigator Pierce regarding "how to pay" Chand $1,000. There is an ambiguity in the question, which makes it impossible to determine whether the question calls for the disclosure of confidential communications. If the question implicates Dubbs's legal opinions regarding Chand, the answer would be privileged, as the fact that Dubbs communicated her opinions to an investigator retained by CCP would not render the opinions unprivileged. However, if the answer to the question simply involves Pierce's communications to Dubbs conveying Chand's desire to be paid and/or the means by which he would prefer to be paid, the privilege would not apply. Chand was not a client of CCP. His communications to CCP's investigator, even if subsequently conveyed to CCP, would not be privileged attorney-client communications.

In sum, questions 5, 6, 10, and possibly 7, sought "confidential communications," including attorney legal opinions, protected by the attorney-client privilege. Attorney Dubbs should not have been compelled to answer these questions. We now turn to a consideration of the work product privilege.

2. *The Absolute Work Product Privilege Depends Not on the Existence of a Writing but Rather on the Nature of the Claimed Privileged Matter*

■ As noted above, the work product privilege is currently codified in section 2018.030 (see fn. 7, *ante*). Subdivision (a) of that section provides an *absolute* privilege for "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories," and subdivision (b) provides a *qualified* privilege for all attorney work product "other than a writing described in subdivision (a)."[12] We will refer to an attorney's "impressions, conclusions, opinions, or legal research and theories" by the shorthand phrase "opinion work product." Based on the statutory language, the trial court concluded that *writings* encompassing opinion work product are protected by the absolute privilege, but the opinion work product itself, if not reduced to writing, is protected by only a qualified privilege.

While the plain language of this statute is perhaps amenable to the interpretation adopted by the trial court, further investigation of the issue suggests that a different interpretation is also possible. It may be that the Legislature believed that statutory protection was necessary *only* for written work product, and simply limited the entire statute's scope to writings, as writings were all that needed statutory protection. That is, the absolute privilege was expressly provided for written opinion work product, and the

---

[12] Work product protected by the *qualified* privilege is discoverable only on a showing that denial of discovery will unfairly prejudice the party seeking discovery in the preparation of its case or will result in an injustice. (§ 2018.030, subd. (b).)

qualified privilege's application to all "other" "work product" was intended to apply to written nonopinion work product. The statutory language is amenable to this interpretation as well.

Moreover, a comparison of section 2018.030 to the federal work product privilege, found at rule 26(b)(3) of the Federal Rules of Civil Procedure (28 U.S.C.), demonstrates the reasonableness of this interpretation. The federal rule provides, in pertinent part, that "documents and tangible things that are prepared in anticipation of litigation or for trial" by a party's attorney are discoverable only when the party seeking discovery shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. (*Ibid.*) However, the rule further provides that if discovery of such materials is ordered, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney."[13] (Fed. Rules Civ. Proc., rule 26(b)(3)(B), 28 U.S.C.) In other words, the Federal Rules of Civil Procedure *define* work product as "documents and tangible things that are prepared in anticipation of litigation or for trial." The federal rules then provide absolute protection for opinion work product and a qualified protection for all other work product. While the California statute does not expressly define work product at all, the statute's language can be read, as already noted, to suggest a legislative intent that it have application only to *written* work product.

If this interpretation is correct, it raises a second question: Did the Legislature's restriction of the statutory protection to written work product intend to leave unwritten work product unprotected, or was there reason to believe the Legislature assumed unwritten work product was already protected? To best understand this issue, it is helpful to turn to the case in which the United States Supreme Court first adopted the work product doctrine, *Hickman v. Taylor* (1947) 329 U.S. 495 [91 L.Ed. 451, 67 S.Ct. 385] (*Hickman*).

The *Hickman* case arose out of a lawsuit filed by the family of a man who drowned when a tugboat on which he was working sank. Counsel for the

---

[13] While this language clearly provides *greater* protection for opinion work product than that provided for other work product, it "leaves room for argument that the immunity conferred on 'hard-core' work product is not absolute, and the federal cases so hold." (*BP Alaska Exploration, Inc. v. Superior Court, supra,* 199 Cal.App.3d at p. 1250.) Nonetheless, federal cases acknowledge that this type of work product is afforded " 'near absolute protection from discovery' " (*In re Cendant Corp. Securities Litigation* (3d Cir. 2003) 343 F.3d 658, 663), and is " 'virtually undiscoverable' " (*U.S v. Deloitte LLP* (D.C. Cir. 2010) 391 U.S. App.D.C. 318 [610 F.3d 129, 135]). Since, under the federal rules, this work product "enjoys an almost absolute immunity from discovery" (*Laxalt v. McClatchy* (D.Nev. 1987) 116 F.R.D. 438, 441), we will refer to this part of the federal work product privilege as absolute, although we acknowledge that, in extreme circumstances, federal law may permit discovery.

tugboat (and its insurers) took statements from the survivors and other potential witnesses, "with an eye toward the anticipated litigation." (*Hickman, supra*, 329 U.S. at p. 498.) Counsel for the plaintiff sought discovery of the witness statements and other materials collected by defense counsel in preparation for the lawsuit. (*Id.* at pp. 498–499.) No showing was made that the witnesses were unavailable to the plaintiff's counsel, and the plaintiff had already obtained discovery from the defendant, so the plaintiff knew the facts on which the defendant planned to rely. (*Id.* at pp. 508–509.) The Supreme Court stated, "We are thus dealing with an attempt to secure the production of written statements and mental impressions contained in the files and the mind of the attorney . . . without any showing of necessity or any indication or claim that denial of such production would unduly prejudice the preparation of petitioner's case or cause him any hardship or injustice." (*Id.* at p. 509.) The court concluded that the discovery request contravened the public policy underlying the orderly prosecution and defense of legal claims. "Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." (*Id.* at p. 510.) The court ultimately concluded that work product may be discoverable in certain circumstances, none of which were present in the case before it. (*Id.* at pp. 511–513.)

However, although the Supreme Court concluded that written work product may sometimes be discoverable, the court's analysis began from the premise that an attorney's thoughts are *inviolate*, and the *Hickman* opinion never suggested that the law should be otherwise. The court stated that an attorney's work "is reflected . . . in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed . . . the 'work product of the lawyer.' *Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own.* Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." (*Hickman, supra*, 329 U.S. at p. 511, italics added.) In other words, the United States Supreme Court extended protection to written opinion work product because unwritten opinion work product was already inviolate.

We return to section 2018.030. There are three possible interpretations of its language. First, the statute may provide absolute protection to written opinion work product and qualified protection to all other work product, written and unwritten. Second, the statute may provide absolute protection to written opinion work product, qualified protection to written nonopinion work product, and leave unwritten work product unprotected. Third, the statute

may provide absolute protection to written opinion work product and qualified protection to written nonopinion work product, with the implicit understanding that unwritten opinion work product is already entitled to absolute protection. We conclude that the third interpretation is the proper one, based on considerations of (a) legislative history; (b) interpretation of the similar federal work product privilege; and (c) avoiding absurdity.

###### a. *Legislative History*

The history of the work product privilege in California has been set forth at length in *Dowden v. Superior Court* (1999) 73 Cal.App.4th 126, 130–133 [86 Cal.Rptr.2d 180]. Key for our purposes are the facts that (1) in the federal system, the work product privilege was adopted by the United States Supreme Court in *Hickman* and (2) thereafter, the California Supreme Court concluded that, despite the persuasiveness of the *Hickman* opinion, adoption of a work product privilege in California was a matter for the Legislature, not the courts. (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 401 [15 Cal.Rptr. 90, 364 P.2d 266].) The result was the enactment, in 1963, of an amendment to then section 2016, which adopted a work product privilege in California.[14] (Stats. 1963, ch. 1744, § 1, pp. 3477–3478.) The added language provided, in language very similar to that now found in section 2018.030, as follows: "The work product of an attorney shall not be discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing his claim or defense or will result in an injustice, and any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."[15]

References in the legislative history indicate that the Legislature believed that the effect of the statute was to "establish in California substantially the same rule" as *Hickman*, and the "numerous decisions of other U.S. courts in interpreting and applying the rule." (State Bar of Cal., letter to Gov. Edmund G. Brown, July 2, 1963, p. 2; Mem. entitled "Explanation of Senate Bill 24" in legislative bill file of Sen. James Cobey, May 29, 1963, p. 2.) Thus, the California Legislature appears to have had the intent of adopting the rule of *Hickman* which, as we discussed above, protected written opinion work product because it assumed unwritten opinion work product was already inviolate.

---

[14] Prior to oral argument, we granted the request of amici curiae supporting Fireman's Fund to take judicial notice of the relevant legislative history.

[15] Clearly, this language contains the same inherent ambiguities as in the current language, as it provides for absolute protection for "any writing" that reflects opinion work product and qualified protection for all other attorney work product, without defining the term.

In addition, the legislative history is replete with indications that the Legislature believed that by enacting the statute, it was providing absolute protection for *all* opinion work product—not that it was leaving unwritten opinion work product open to discovery (even under a showing of good cause). For example, the Senate Committee on Judiciary explained: "The amendment would limit discovery to protect attorneys and therefore their clients in the preparation and investigation of cases, and specifically would deny discovery of reports and opinions of experts obtained in anticipation of litigation and anything 'created' by or for a party or his agent. *Under no circumstances could the 'mental impressions, conclusions, opinions or legal theories' of an attorney be reached.* Recent case law indicates that in view of the legal theory under which such matters might be protected, legislation is necessary to accomplish the purpose of the amendment." (Sen. Com. on Judiciary, Analysis and Final Action on the Measures Considered by this Committee During the 1963 Regular Session of the Legislature, p. 27, italics added.) Other documents indicate that one of the effects of the bill was "to prohibit the discovery of that portion of lawyers' work product reflecting an attorney's impressions, conclusions, and theories." (Sen. James A. Cobey, letter to Gov. Edmund G. Brown, July 22, 1963, p. 1; see State Bar of Cal., letter to Gov. Edmund G. Brown, July 2, 1963, p. 2.) In short, there is every indication in the legislative history that the California law was intended to absolutely protect opinion work product in every form, and no indication that it was intended to provide lesser protection for unwritten work product.[16]

### b. The Similar Federal Work Product Privilege Is Interpreted Similarly

It is useful to consider the way federal courts have resolved the issue of the protection to be accorded unwritten opinion work product. There are two lines of analysis taken in the federal cases, both of which reach the conclusion that unwritten opinion work product is entitled to absolute protection.

---

[16] A contemporaneous law review comment suggested that "like its federal model, the proviso's deficiency lies in its illogical limitation of absolute protection to subjective writings of an attorney. The Bar's purpose would thus be frustrated if, upon a sufficient showing of necessity, a party acquires the private thoughts of his opponent's attorney by deposition or interrogatory." (Comment, *California Discovery Since* Greyhound: *Good Cause for Reflection* (1963) 10 UCLA L.Rev. 593, 611–612.) Yet there is no illogic involved if the California Legislature, like the United States Supreme Court in *Hickman*, believed that unwritten opinion work product was already inviolate. (But see *Trade Center Properties, Inc. v. Superior Court* (1960) 185 Cal.App.2d 409, 411 [8 Cal.Rptr. 345] [implying, in dicta, that counsel could "pick[ opposing counsel's] brain[]" in a deposition, upon a showing of "extremely good cause"].)

One line of cases takes the position that rule 26(b)(3) of the Federal Rules of Civil Procedure (28 U.S.C.) protects *only* documents and tangible things, but *Hickman* itself "provides work-product protection for intangible work product independent of Rule 26(b)(3)." (*U.S. v. Deloitte LLP, supra,* 610 F.3d at p. 136; see also *Ford v. Philips Electronics Instruments Co.* (E.D.Pa. 1979) 82 F.R.D. 359, 360 [although the federal rule is limited to documents and tangible things, intangible opinion work product is not otherwise discoverable].) As the California Legislature intended to establish substantially the same rule as *Hickman* in California, and federal courts have interpreted *Hickman* to itself provide absolute protection for unwritten opinion work product, this suggests the California law provides similar protection.

The second line of cases acknowledges that the language in Federal Rules of Civil Procedure, rule 26(b)(3) (28 U.S.C.) is limited to written work product, but nonetheless interprets the rule to extend its protection to intangible work product. "[T]he courts have rejected an interpretation of Rule 26(b)(3) that provides protection only for an attorney's mental impressions that are contained in 'documents and tangible things.' [Citations.] These decisions make clear that a party cannot discover what an attorney said to a witness in interviewing him or in preparation for his deposition because such statements are likely to reveal the attorney's mental impressions, opinions and theories of the case." (*Connolly Data Systems, Inc. v. Victor Technologies, Inc.* (S.D.Cal. 1987) 114 F.R.D. 89, 96;[17] see also *Laxalt v. McClatchy, supra,* 116 F.R.D. at p. 441; *Phoenix National Corp. v. Bowater United Kingdom Paper Ltd.* (N.D.Ga. 1983) 98 F.R.D. 669, 671.) These cases support the conclusion that similar language in California's work product statute should not be read to limit the privilege's protection solely to written work product.

While the federal cases reach their results on different theories, they are in agreement that unwritten opinion work product is absolutely privileged—based on the policy set forth in *Hickman.* Thus, both lines of cases are of assistance in interpreting the California privilege, and both support the conclusion that unwritten opinion work product is absolutely privileged.

c.   *Avoiding Absurdity*

■   "A court must construe a statute reasonably, endeavoring to ascertain the legislative intent. If the construction does not result in patently absurd results, we may not construe a statute contrary to its plain language and ostensible intent merely because we disagree with the wisdom thereof." (*Lasky, Haas, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264,

---

[17] This opinion applied federal law of work product, but noted that California law is similar and that the result would be the same had California law been applied. (*Connolly Data Systems, Inc. v. Victor Technologies, Inc., supra,* 114 F.R.D. at p. 95, fn. 4.)

279 [218 Cal.Rptr. 205].) Under the trial court's interpretation of the language of section 2018.030, written opinion work product is protected by an absolute privilege, while unwritten opinion work product is protected by only a qualified privilege. Is it patently absurd to provide a greater protection for written opinion work product than unwritten opinion work product? In our view, the answer to that question is yes.

■ Case law has explained that the work product "doctrine protects the ' "mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." ' " (*2,022 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, 1390 [7 Cal.Rptr.3d 197].) Yet, an attorney is not provided a privileged area in which to prepare the case when only those attorney opinions which have been reduced to writing are absolutely protected.

Moreover, such an interpretation of the privilege would inevitably result in attorneys documenting their every thought (in order to obtain complete protection for their work product) at the expense of higher client bills for the time taken in documentation, and at the risk of malpractice lawsuits if the failure to document an opinion resulted in its being held discoverable. We cannot conclude that our Legislature intended such absurd results.[18]

### d. *Application of Work Product Privilege*

■ Based on the foregoing analysis, we conclude that unwritten opinion work product is entitled to the protection of the absolute work product privilege in California. Having concluded that unwritten opinion work product is absolutely protected under California law, we turn to the deposition questions at issue in this case. ■ As we discussed above, questions 5, 6, and 10 sought the legal opinions of Fireman's Fund's attorneys. As such, while the questions invaded the attorney-client privilege, the questions also sought unwritten opinion work product of Fireman's Fund's attorneys, and therefore ran afoul of the absolute work product privilege. Similarly, question 7 sought the discussions between Dubbs and investigator Pierce regarding how to pay Chand $1,000. To the extent the question sought Dubbs's unwritten opinion work product regarding Chand, the absolute privilege is implicated.[19] Question 9 asked Attorney Dubbs which subpoenas she prepared based on any documents received from Chand. This clearly implicates

---

[18] Indeed, the result is the mirror image of the result which concerned the Supreme Court in *Hickman*—that unless written opinion work product were protected, attorneys would never write anything down. (*Hickman, supra,* 329 U.S. at p. 511.) Clearly, if *only* written opinion work product were absolutely protected, attorneys would *always* write *everything* down. Each situation is equally absurd.

[19] As the parties and amici curiae briefed only the application of the absolute work product privilege, the issue of the possible application of the qualified work product privilege to the

her opinion work product and is therefore subject to the absolute privilege. The motion to compel therefore should have been denied with respect to questions 5, 6, 9, and 10, and part of question 7.

## DISPOSITION

The petition for writ of mandate is granted. Upon remand, the trial court is directed to vacate its order of November 18, 2010, and to enter a new and different order sustaining petitioners' objections to deposition questions 5, 6, 9 and 10, and that part of question 7 seeking Attorney Dubbs's opinions with respect to Chand. The trial court (or the Referee pursuant to the trial court's referral and designation orders) shall conduct such further proceedings as may be appropriate and consistent with the views expressed herein. Fireman's Fund shall recover its costs in these appellate proceedings.

Klein, P. J., and Kitching, J., concurred.

---

remaining portion of question 7 is not before us. In any event, the Referee's analysis of the qualified privilege (adopted by the trial court) was based on the Referee's belief that the entire question was subject to the qualified privilege, and we have now concluded that a portion of the question sought information subject to the absolute privilege. As such, if, on remand, real parties in interest seek to question Attorney Dubbs regarding the subject matter of question 7, exclusive of Dubbs's opinions of Chand, and no agreement can be reached, the Referee should redetermine whether this limited inquiry implicates information subject to the qualified work product privilege and whether real parties in interest's need for that information is enough to outweigh the privilege and compel discovery.