Filed 5/26/21  Willis v. L.A. County Waterworks Dist. No. 40 CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Coordination Proceeding Special Title (Rule 3.3550(c)) | F082766 |
| ANTELOPE VALLEY GROUNDWATER CASES* | (JCCP No. 4408) |
| REBECCA LEE WILLIS et al., | |
| Plaintiffs and Appellants, | |
| v. | **OPINION** |
| LOS ANGELES COUNTY WATERWORKS DISTRICT NO. 40 et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Jack Komar, Judge.†

---

*Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Los Angeles County, No. BC325201); *Los Angeles County Waterworks District No. 40 v. Diamond Farming Co.* (Super. Ct. Kern County, No. S-1500-CV254348); *Wm. Bolthouse Farms, Inc. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC353840); *Diamond Farming Co. v. City of Lancaster* (Super. Ct. Riverside County, No. RIC344436); *Diamond Farming Co. v. Palmdale Water Dist.* (Super. Ct. Riverside County, No. RIC344668); *Willis v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC364553); *Wood v. Los Angeles County Waterworks District No. 40* (Super. Ct. Los Angeles County, No. BC391869).

†Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Niddrie Addams Fuller Singh, David A. Niddrie, Victoria E. Fuller; The Kalfayan Law Firm, Ralph B. Kalfayan; The Katriel Law Firm, Roy A. Katriel; and Gregory L. James for Plaintiffs and Appellants.

Mary Wickham, County Counsel, Warren R. Wellen, Deputy County Counsel; Best Best & Krieger, Eric L. Garner, Jeffrey V. Dunn, Wendy Y. Wang; Olivarez Madruga Lemieux O'Neill, Wayne K. Lemieux, W. Keith Lemieux; Murphy & Evertz, Douglas J. Evertz; Lagerlof, and Thomas S. Bunn III for Defendants and Respondents.

-ooOoo-

Appellants (Willis or the Willis Class) appeal from an order denying a motion for an award of attorney fees and costs in the coordination proceeding known as the Antelope Valley Groundwater Cases (AVGC).  Willis sought over $2.2 million from respondents (the Public Water Suppliers or PWS) for work performed in the AVGC from January 1, 2012, through December 31, 2015.  However, in a settlement reached between the parties in 2010 and incorporated into a judgment in 2011, Willis had agreed to "not seek any attorneys' fees and/or costs from [the PWS]" except under certain circumstances.

The parties negotiated specific prerequisites for the filing of any motion by Willis for the recovery of postsettlement fees and costs from the Public Water Suppliers. Respondents correctly argue that none of the prerequisite conditions existed.  We therefore affirm the challenged order.

## FACTUAL AND PROCEDURAL BACKGROUND

This court recently decided a related matter, *Antelope Valley Groundwater Cases* (2021) 62 Cal.App.5th 992 (*Antelope Valley III*).  We incorporate by reference the factual and procedural background set forth therein, which is partially repeated and supplemented here to frame the issues in this appeal.

*Overview*

The AVGC concern the existence and priority of water rights in the Antelope Valley Groundwater Basin (the basin or aquifer).  The basin spans more than 1,000

2.

square miles across parts of southeastern Kern County and northeastern Los Angeles County.  A large portion of the overlying land is owned by the federal government, but there are thousands of private citizens and entities who also own real property in the area.

The Public Water Suppliers are a group of public agencies and special districts that pump groundwater from the basin and supply water to customers throughout the arid region.  The Willis Class comprises nongovernmental landowners who had not pumped groundwater from the basin but wished to protect whatever rights they had to do so in the future.  There are many additional AVGC litigants, but they are not directly involved in the dispute over Willis's claimed entitlement to fees and costs.

*Presettlement Litigation (1999–2010)*

The earliest lawsuits concerning rights to the subject groundwater commenced in 1999 and 2000.  In 2004, respondent Los Angeles County Waterworks District No. 40 (District 40) filed an action seeking (1) a comprehensive determination of the rights of thousands of individuals, companies, public water suppliers, public agencies, and the federal government to extract water from the basin and (2) a physical solution to alleviate alleged overdraft conditions and protect the basin's groundwater supply.  District 40 sought to establish that it and other public water suppliers had prescriptively acquired groundwater rights superior to those of nongovernmental landowners.

In 2005, the Judicial Council coordinated the various actions, which collectively became known as the AVGC.  In 2006, the trial court issued an order declaring the jurisdictional boundaries of the aquifer, i.e., the Antelope Valley Adjudication Area (AVAA).  The first of six phases of trial proceedings (Phases 1–6) had been devoted to establishing those boundaries, which was essential to determining the necessary parties to any global adjudication of rights to the basin's groundwater.

In 2007, the Public Water Suppliers filed a class action cross-complaint in the AVGC seeking essentially the same relief as requested in District 40's original pleading.  During the same year, Willis filed a class action complaint against the Public Water

Suppliers.  The Willis Class sought to establish that their rights to the present and future overlying uses of the groundwater were superior to those of the PWS.

In 2008, Phase 2 commenced to establish the hydrologic nature of the aquifer within the boundaries of the AVAA.  The issue was whether there were any distinct groundwater subbasins that did not have hydrologic connection to other parts of the aquifer.  The trial court found all areas of the AVAA were sufficiently hydrologically connected to constitute a single aquifer for purposes of the coordinated proceedings.

In 2009, the PWS moved to transfer and consolidate all pending AVGC actions and cross actions.  The motion was granted in early 2010.  The consolidation order stated, in relevant part:  "If the basin is in overdraft (a fact still to be established), the Court … would of necessity have to look at the totality of pumping by all parties, evaluate the rights of all parties who are producing water from the aquifer, determine whether injunctive relief [is] required, and determine what solution equity and statutory law require[s] (including a potential physical solution).…  [¶] … [¶] … Consolidation of the water rights claims will result in a comprehensive adjudication and a judgment that will affect all the parties."  The parties were authorized to settle "any or all claims between or among them[selves],  as long as any such settlement expressly provide[d] for the Court to retain jurisdiction over the settling parties for purposes of entering a judgment resolving all claims to the rights to withdraw groundwater from the [basin] as well as the creation of a physical solution if [necessary]."

*The Settlement Agreement (2010–2011)*

In July 2010, Willis and the PWS reached a comprehensive settlement of their *inter se* disputes.  The written agreement acknowledged the PWS claimed to have prescriptively acquired rights to a substantial percentage of the basin's native safe yield, while the Willis Class had asserted the PWS had no prescriptive rights against them.  The PWS maintained the basin had a native safe yield of 82,300 acre-feet per year (afy) and a total safe yield of 110,500 afy, but the parties agreed to be bound by the trial court's

4.

future determination of those amounts. The parties also acknowledged the United States' entitlement to a portion of the native safe yield (the Federal Reserved Right), and they agreed to be bound by the court's future determination of that amount.[1]

The term "Federally Adjusted Native Safe Yield" was used to refer to the basin's native safe yield "less the prior year's production of water by the United States (not to exceed the Federal Reserved Right)." Willis agreed the PWS had a right to collectively "produce up to 15% of the [b]asin's Federally Adjusted Native Safe Yield free of any Replacement Assessment." The PWS agreed Willis had an "Overlying Right to a correlative share of 85% of the Federally Adjusted Native Safe Yield for reasonable and beneficial uses on their overlying land free of any Replacement Assessment."[2]

The PWS agreed to "not take any positions or enter into any agreements that are inconsistent with the exercise of the Willis Class Members' Overlying Right to produce and use their correlative share of 85% of the [b]asin's Federally Adjusted Native Safe Yield." However, the terms of the settlement did not allocate a specific quantity of water or percentage of the Federally Adjusted Native Safe Yield to Willis. Willis acknowledged other AVGC litigants might have correlative rights to the Federally Adjusted Native Safe Yield, and the parties' definition of "Correlative Rights"

---

[1]The term "safe yield" generally refers to the amount of water that can be extracted annually without risking permanent depletion of the supply. (*Wright v. Goleta Water Dist.* (1985) 174 Cal.App.3d 74, 81, fn. 2.) The parties defined native safe yield as "the amount of pumping, which under a given set of land use and other prevailing cultural conditions, generates Return Flows [i.e., the return of water to the basin] that, when combined with naturally occurring groundwater recharge to the [b]asin, results in no long-term depletion of [b]asin groundwater storage." Total safe yield was defined the same way but further accounted for replenishment of the supply with water originating from outside of the basin.

[2]The term "Overlying Right" was defined as the appurtenant right to use groundwater from the native safe yield "for overlying reasonable and beneficial use." The term "Replacement Assessment" was defined as a charge imposed on any settling party "by the Watermaster" (i.e., "the person or entity appointed by the [trial court] to monitor and manage the [b]asin's groundwater") for producing more water than the settling party was entitled to produce from the basin under the terms of the settlement or pursuant to a court order issued in the AVGC.

recognized "that, if the supply of water is insufficient for all reasonable and beneficial needs, [all holders of Overlying Rights are] entitled to a fair and just proportion of the [available] water."

The term "Physical Solution" was defined as "a mechanism that comprehensively resolves the competing claims to the [b]asin's water and provides for the management of the [b]asin." Both parties agreed "to be part of such a Physical Solution to the extent it is consistent with the terms of [the settlement agreement]," and to "cooperate and coordinate their efforts in any … trial or hearing so as to obtain entry of judgment consistent with the terms of [the settlement agreement]." Those provisions "[did] not require Willis Class counsel to participate in any such trial or render any efforts absent written agreement of [the PWS] to compensate them for such efforts," nor did they preclude the Public Water Suppliers "from participating in any further proceedings that may affect their rights."

The parties negotiated a provision regarding attorney fees and costs. The PWS acknowledged "that Willis Class counsel intend[ed] to seek an award of their fees and costs" incurred from Willis's earliest involvement in the AVGC through a future date when the trial court entered a final judgment approving the settlement. It was noted the PWS would "likely oppose the motion for fees and costs."

The provision further stated: "Willis Class Counsel agree that they will not seek any attorneys' fees and/or costs from [the PWS] for any efforts Willis Class Counsel undertake after the Court's entry of Final Judgment approving the Settlement, except with respect to the following:"

> "(a) any reasonable and appropriate efforts by Willis Class Counsel to enforce the terms of this [settlement agreement] against [the PWS] in the event [the PWS] fail to comply with a provision of this [settlement agreement];"

> "(b) any reasonable and appropriate efforts by Willis Class Counsel to defend against any new or additional claims or causes of action asserted

6.

by [the PWS] against the Willis Class in pleadings or motions filed in the [AVGC];"

"(c) any reasonable and appropriate efforts by Willis Class Counsel that are undertaken in response to a written Court order stating that, pursuant to this provision, Class counsel may seek additional fees for specified efforts from [the PWS] pursuant to Code of Civil Procedure section 1021.5;"

"(d) any reasonable and appropriate efforts by Willis Class Counsel that are undertaken in response to a written request by [the PWS] executed by counsel for [the PWS] that Class Counsel participate in future aspects of the [AVGC] (e.g., the negotiation of a Physical Solution); or"

"(e) any reasonable and appropriate efforts that Willis Class Counsel render to defend a fee award in their favor in the event the [PWS] appeal such a fee award and the Court of Appeal affirms the fee award in the amount of 75 percent or more of the fees awarded by the Superior Court."

In November 2010, the trial court granted a motion for preliminary approval of the settlement agreement. In 2011, Willis filed a motion to recover attorney fees and costs for work performed in the AVGC from November 2006 through December 2010. The motion was made pursuant to Code of Civil Procedure section 1021.5 (section 1021.5), which is "a codification of the 'private attorney general' attorney fee doctrine." (*Woodland Hills Residents Assn.*, *Inc. v. City Council* (1979) 23 Cal.3d 917, 933.)

In March 2011, the trial court approved the parties' settlement agreement but deferred entry of a judgment thereon until the issue of fees and costs was resolved. Two months later, Willis was awarded more than $1.8 million in attorney fees. The settlement agreement and monetary award were incorporated into a "Final Judgment Approving [The] Willis Class Action Settlement." (Boldface and some capitalization omitted.)

Willis later moved for a "supplemental fee award" based on attorney services rendered "from January 1, 2011 through May 13, 2011 when the Court entered Judgment approving the settlement." This motion was also granted. Pursuant to the rulings on both motions, the Willis Class was awarded approximately $2 million in attorney fees and $65,000 in litigation costs, plus a $10,000 incentive award for the class representative.

7.

In September 2011, the trial court amended its earlier judgment to update the total award of fees and costs in favor of Willis and against the PWS. The parties' 2010 settlement agreement and the 2011 amended judgment into which the settlement agreement was incorporated are hereafter collectively referred to as the "Settlement."

*Subsequent Phases and Proceedings (2011–2015)*

**Phases 3 & 4**

Phase 3 was conducted in 2011 during the same period as some of the motion proceedings concerning the Settlement. In July 2011, the court found the basin was in a state of overdraft due to decades of unregulated extractions of groundwater. The total safe yield was determined to be 110,000 afy.

Phase 4, conducted in 2013, focused on the levels of groundwater production during 2011 and 2012. The court found the collective pumping by dozens of parties had exceeded 120,000 afy in both years of the sample period. Those figures did not include the production of thousands of overlying landowners whose individualized pumping historically had not exceeded 25 afy, i.e., the "Wood Class." Therefore, ongoing groundwater production was exceeding what the trial court had determined (in Phase 3) to be the total safe yield.

**Phase 5 and Physical Solution Negotiations**

Phase 5 began in February 2014. The trial court limited this phase "to the issues of federal reserved water rights and claimed rights to return flows from imported water." After a few days of evidence presentation, the trial court granted a stay of the proceedings to facilitate large-scale settlement negotiations. By April 2014, nearly all AVGC litigants had tentatively agreed to the terms of a Physical Solution. In the following months, those parties worked on drafting and editing a stipulated judgment and Physical Solution for the trial court's approval.

In August 2014, the Willis Class filed a case management conference (CMC) statement advising the trial court it had not participated in the negotiation or drafting of the proposed Physical Solution. Willis claimed its counsel had reviewed a draft of the proposal, which the stipulating parties had allegedly presented to the attorney "on a 'take it or leave it' basis." Counsel had responded by asserting "that any agreement which subordinates or extinguishes the groundwater rights of the Willis class would not be consistent with the [2011 Settlement] and would be met with vigorous opposition." Accordingly, Willis informed the trial court that "any attempts by the overlying pumping landowners and the public water suppliers to subordinate the Willis class, extinguish its groundwater rights to the native safe yield, or exclude it from the native safe yield will be opposed."

In September 2014, Willis filed another CMC statement. This filing discussed class counsel's recent participation "in several rounds of discussions with the various parties regarding a proposed physical solution for the basin." Willis asserted "that the terms relative to the [Willis Class] contained in the presently proposed agreement contravenes well settled principles of law on the rights of overlying landowners, interferes with the due process rights of the class, conflicts with settled equitable principles, and are wholly inconsistent with the [2011 Settlement]."

In October 2014, the trial court requested proposals for a "briefing and hearing schedule" on the stipulating parties' request for approval of the proposed final judgment and Physical Solution. The United States submitted, on behalf of itself and other stipulating parties, a "proposed Case Management Order" (CMO). The Willis Class filed a "partial opposition," objecting in particular to any "briefing schedule for exchange of witnesses and exhibits, discovery, and trial in connection with 'claims or rights to produce groundwater from the Basin by Non-stipulating Parties.'" (Italics omitted.)

At a CMC held on November 4, 2014, the trial court adopted and signed the proposed CMO. The CMO established, inter alia, a schedule pertaining to a motion for

9.

preliminary approval of a settlement agreement between the Public Water Suppliers and the Wood Class. The CMO also set a schedule for Phase 6, i.e., "[t]rials or hearings on … prove-up of the Stipulated Judgment and Physical Solution."

In this appeal, Willis repeatedly argues the CMO constituted "an order requiring that the Willis Class participate in a complex trial that ultimately resulted in the adoption of the Physical Solution." The argument ostensibly relates to one of the prerequisite conditions in the 2011 Settlement for a motion to recover post-Settlement attorney fees and costs. The parties had agreed such a motion could be based upon "any reasonable and appropriate efforts by Willis Class Counsel … undertaken in response to a written Court order stating that, pursuant to [the attorney fees provision of the Settlement], Class counsel may seek additional fees for specified efforts from [the PWS] pursuant to Code of Civil Procedure section 1021.5."

In its opposition to the proposed CMO, Willis asked the trial court to declare it was "exempt" from any trial proceedings concerning the Physical Solution. Counsel said, "I just want clarification of that on the record." Counsel further stated his understanding that "the fate of the Willis Class" rested on Willis's forthcoming written objections to the proposed Physical Solution. Counsel believed the trial court's rulings on the objections would "determine … whether or not that Physical Solution that is being proposed is consistent with the [2011 Settlement] or is not consistent with the [2011 Settlement]."

The trial court did say, as quoted in Willis's opening brief, "The prove up by the stipulating parties [i.e., Phase 6] is something that I suspect that [Willis's counsel] might want to appear and address …. [¶] … Because that is going to be something that could impact on his client as well as everybody else that resides in the [AVAA]." However, the trial court also told counsel, "[Y]ou are asking me to interpret what your obligation is. I can't do that other than to tell you that your—if the court were to have a trial in this proceeding and would make a judgment determining what the resolution would be by

10.

way of a physical solution or otherwise[,] [it] would be binding on all of the parties to the lawsuit."

At another point during the CMC, the trial court told Willis's counsel, "[I]f the court signs this [proposed CMO] just the way it is, you can figure out what you need to do. I can't tell you what you need to do. It's entirely up to you." Later, counsel again said, "I need clarity." The trial court replied, "I don't think I can give you that clarity."

**Interim Proceedings**

In late 2014 and during part of 2015, a two-stage trial was held on the claims of another nonstipulating party, Phelan Piñon Hills Community Services District (Phelan).[3] The trial court also preliminarily approved the settlement between the PWS and the Wood Class. Meanwhile, the Willis Class filed a series of motions designed, in whole or in part, to establish its ability to seek attorney fees and costs for work performed in opposition to the proposed Physical Solution.

In March 2015, Willis filed a "Motion to Obtain a Court Order for Permission to Seek Additional Attorneys' Fees." The stated ground for the motion was "paragraph VIII.D.(c) of the [2011 Settlement]." As discussed above, the Settlement authorized Willis to seek post-Settlement attorney fees for "reasonable and appropriate efforts … undertaken in response to a written Court order stating that, pursuant to [the attorney fees provision of the Settlement], Class counsel may seek additional fees for specified efforts from [the PWS] pursuant to Code of Civil Procedure section 1021.5."

At the motion hearing, Willis's counsel argued "the agreement was before we do the work, we come into court and ask the court for a court order." The trial court rejected this argument, stating, "It does not so provide that you come to the court and ask. But

---

[3]Phelan was a party to the 2011 Settlement but is not involved in this appeal. Because Phelan did not stipulate to the proposed Physical Solution, Willis did not attempt to hold Phelan responsible for its post-Settlement attorney fees and costs.

even if it did, the court is not going to authorize the expenditure of attorney's fees and costs in advance." The motion was denied.

Between May and August 2015, Willis filed two separate motions "to enforce" the 2011 Settlement, as well as a "motion to enforce due process rights." (Boldface and capitalization omitted.) The styling of these motions alluded to the Settlement provision authorizing Willis to seek attorney fees and costs for "any reasonable and appropriate efforts by Willis Class Counsel to enforce the terms of [the Settlement] against [the PWS] in the event [the PWS] fail to comply with a provision of [the Settlement]." Willis argued the proposed Physical Solution was inconsistent with the 2011 Settlement and alleged the PWS had breached the Settlement by supporting a Physical Solution that deprived Willis of the right to pump groundwater from the native safe yield.

The trial court heard extensive argument on the "enforcement" motions and denied them without prejudice. In September 2015, Willis "re-noticed" the motions for further hearing and consideration. The trial court incorporated the issues into Phase 6 and ultimately rejected Willis's contentions (see *post*).

**Phase 6**

The Phase 6 trial proceedings began in late September 2015 and concluded approximately five weeks later. On December 28, 2015, the trial court entered a final judgment (the Judgment) approving and adopting the proposed Physical Solution, which was attached thereto and incorporated by reference therein. A 28-page "Statement of Decision" explained the basis for the trial court's rulings. We summarized Phase 6 and the Judgment in detail in *Antelope Valley III* and need not repeat the summary here. It suffices to note the following:

The trial court found the amounts of groundwater "reasonably and beneficially used" by the stipulating parties collectively exceeded the total safe yield of 110,000 afy (i.e., the native safe yield of 82,300 afy plus the amount from "imported supplemental

water supplies"). The United States was found to have established its Federal Reserved Right and was entitled, under the Physical Solution, to pump up to 7,600 afy from the native safe yield. Members of the Wood Class were allocated up to 3 afy per existing household for reasonable and beneficial use on their overlying land, with known class members' aggregate use of the native safe yield limited to 3,806.4 afy. The balance of the native safe yield was allocated as production rights among the remaining overlying producers, including overlying private landowners, various mutual water companies, public overlying landowners, and various state agencies. The allocation to the PWS was approximately 15 percent of the Federally Adjusted Native Safe Yield.

The Public Water Suppliers were found to have acquired a prescriptive right, as against certain nonstipulating parties (not including Willis), to collectively pump approximately 32,000 afy of the native safe yield, which was greater than the amount allocated to the PWS in the Physical Solution. There were no findings of prescriptive rights held by the PWS vis-à-vis Willis. Under the terms of the 2011 Settlement, Willis had already acknowledged the PWS's right to 15 percent of the Federally Adjusted Native Safe Yield.

The Judgment and Statement of Decision recognized the groundwater rights of the Willis Class as overlying landowners. However, by class definition, those rights had never been exercised. The Statement of Decision explains that, "despite the Willis Class' settlement with the Public Water Suppliers limiting the impact of the [PWS's] prescriptive right, the [trial court found] multiple grounds to condition the unexercised overlying rights of the Willis Class." Since the reasonable and beneficial use of groundwater by other private landowners "exceeded the native safe yield while public water supplier pumping was taking place," the trial court concluded "the unexercised overlying rights of the Willis Class are not entitled to an allocation in the Physical Solution."

13.

The trial court also found "that the native safe yield allocations amongst the parties in the Physical Solution make maximum reasonable and beneficial uses of the native safe yield" and require those parties "to make severe reductions in their current and historical reasonable and beneficial water use." "[T]he Willis Class overlying rights cannot be quantified because they have no present reasonable beneficial use; their future groundwater needs are speculative; substantial evidence shows that the [b]asin's groundwater supply has been insufficient for decades; and unexercised overlying rights create an unacceptable measure of uncertainty and risk of harm to the public …, existing overlying pumpers and public water supplier appropriators."

The Physical Solution established an application process for any "new production" from the aquifer, including by members of the Willis Class. Upon approval by the watermaster, new production is subject to a replacement assessment. However, when such proposed new production is limited to domestic use for one single-family household, the watermaster "has the authority to determine the New Production to be *de minimis* and waive payment of a Replacement Water Assessment."

The arguments made in Willis's "enforcement" motions were addressed and rejected in the Statement of Decision. Most notably, the Physical Solution was deemed consistent with the 2011 Settlement. The trial court further concluded Willis's due process rights had not been violated.

### Motion for Postsettlement Fees and Costs (2016)

In January 2016, Willis filed the motion at issue in this appeal. It was labeled as a "Second Supplemental Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Represent[a]tive Incentive Award." (Boldface and some capitalization omitted.) For ease of reference, we use the term "fees motion."

The fees motion pertained to Willis's involvement in the AVGC from January 1, 2012, through December 31, 2015. Willis claimed between $1,558,080 and $2,143,340 in attorney fees (depending on which of two different rate schedules was used), and

14.

$105,107.62 in litigation costs. Willis also requested a 1.5 multiplier of the lodestar and a $5,000 incentive award for the class representative.

The stated basis for the fees motion was section 1021.5. "Section 1021.5 authorizes an award of fees when (1) the action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons …,' and (3) 'the necessity and financial burden of private enforcement … are such as to make the award appropriate ….'" (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1026.) In such actions, fees may be awarded "to a successful party against one or more opposing parties." (§ 1021.5.)

Willis's moving papers focused on the section 1021.5 factors. There was little discussion of the Settlement provisions restricting Willis's ability to seek post-Settlement fees and costs; the issue was relegated to the penultimate paragraph of the memorandum of points and authorities. Willis wrote:

> "It is true that in the [Settlement], the Willis Class agreed to not seek a further fee award against the Public Water Suppliers unless one or more of three conditions were satisfied. … With respect to paragraph (a), the efforts of the Willis Class were reasonably intended to enforce the terms of the [S]ettlement with the PWS …. Concerning paragraph (b), the PWS submitted a motion to the Court requesting approval of a physical solution which modified the rights of the [Willis] Class to exercise their correlative rights. In regard to paragraph (c), as previously discussed, the participation of the [Willis] Class in the Phase VI was undertaken pursuant to this Court's case management orders."

The PWS opposed the motion, arguing "(1) such recovery is prohibited under the court-approved [S]ettlement between the Willis Class and the Public Water Suppliers; and (2) the Willis Class has not met its burden under Code of Civil Procedure Section 1021.5."

On April 1, 2016, the fees motion was argued and submitted. On April 25, 2016, the trial court issued a written order denying the motion. The order states, in pertinent part:

15.

"Contrary to the claims of counsel,

"1.  None of the work of counsel for [Willis] materially benefitted or positively affected any part of the [Judgment and Physical Solution]—the rights of the Willis class were the rights of all non-pumpers and were never threatened after the [2011 Settlement].

"2.  [Willis's] correlative rights were as to 85% of the federally adjusted safe yield which meant that they were immune from prescription by the only party who had such a claim—i.e., the PWS, which immunity the [Willis] class obtained in the 2011 [S]ettlement by relinquishing 15% of its otherwise correlative rights basin-wide to the PWS.

"3.  [Willis] had stipulated to be bound by whatever physical solution as nonpumpers the court might establish to resolve aquifer overdraft.

"4.  The [other] overlying owners were not an adverse party to the claims of the Willis Class and in fact there were no claims by the class as non-pumpers to an allocation of specific water production.  The findings of the court in trial Phases 3 and 4 established that there was no surplus from which any new pumping could occur without causing further detriment to the aquifer, so that it was necessary that the court curtail and reduce existing pumping by all water producers, public and private, until the aquifer was in balance.  As a matter of law the court could not take water rights from a water producing entity whose use was reasonable and beneficial and give those rights to a previously non pumping party.  And, the Willis Class never requested an allocable quantity of water to be pumped.

"5.  The Willis Class was unsuccessful in every [post-Settlement] request and application to the court.  As the court stated frequently to all parties, on the record, if the parties who were water producers failed to come up with a solution, the court would be required to impose such on an involuntary basis—but that could not affect the stipulated relationship between the PWS and the Willis Class;

"6.  Willis Class participation was neither mandatory nor appropriate beyond ensuring that [the Settlement] would be incorporated into the final judgment.  However, no party ever objected or made any attempt to modify the [Settlement] or to prevent its enforcement and the PWS uniformly always requested incorporation of the [Settlement] into the [Physical Solution and Judgment] without modification.

"7.  There was no need for [Willis] to be present for the court to make reasonable and beneficial use findings as to the water producers and users, including overlying owners, who pumped and produced water, noting that no claims were made against [Willis's] correlative rights.  There were no new claims or causes of action which would require the defense by class counsel.

"8.  All the benefits to the public and the class occurred in spite of the misplaced opposition [by Willis] to the [P]hysical [S]olution which [Willis] now claims to have been at least a partial cause.

"9.  [Willis] did not prevail and has already been paid for fees for all work prior to the 2011 [Settlement].

"10.  The only parties against whom the court could award fees and or costs to the Willis Class are the PWS but there being no adversity in fact or law between the class and the PWS, such remedy is unavailable.  Moreover, by the terms of the [Settlement], [Willis] agreed not to seek further fees and or costs from the PWS except under three very specific circumstances as specified in Paragraph VIIID of the [Settlement], none of which are applicable here:

"a) If counsel was ordered to participate in the proceedings;

"b) If counsel engaged in reasonable efforts to defend against new claims or causes of action made against the class;

"c) Enforcement of a public right under CCP 1021.5.

"The court did not require an appearance by [Willis] in any phase of the trial after the [Settlement] in 2011.

"The court makes the further following findings:

"1.  [Willis] was not a prevailing party on any major issue;

"2.  The Court denied pre-participation enforcement fees when motion for such was made given the absence of good cause;

"3.  There was no legal adversity between the Willis Class and the PWS after the [2011 Settlement], [the parties] having totally settled the declaratory relief claims of the class and eliminating any further claims of prescription against [Willis] by the PWS.  Nor was there legal adversity between Willis Class and the Landowners or any other parties in the case

17.

since there were no claims by the landowners, or others, against the ownership interest of the [Willis] [C]lass members.

"4. All substantive objections made by [Willis] during the Phase 6 proceedings were overruled as being without merit or foreclosed by the [Settlement];

"5. No competent evidence established that the proposed [P]hysical [S]olution endangered any rights of Willis Class members nor was there any competent or credible evidence that any member of the class was prevented from exercising any rights under the stipulations or harmed by the [P]hysical [S]olution[.]"

### *Appellate Proceedings (2016–2021)*

In February 2016, while the fees motion was pending, Willis filed a notice of appeal as to the underlying Judgment. In May 2016, Willis filed a notice of appeal as to the trial court's order denying the fees motion. For various reasons, briefing in both appeals was not completed until October 2020. In March 2021, this court affirmed the Judgment.

### DISCUSSION

Willis alleges two alternative grounds for reversal. First, Willis argues the terms of the Settlement, i.e., the prerequisite conditions for seeking post-Settlement fees and costs, "were to govern the trial court's determination of whether [the fees motion] should be granted." Although the trial court found the prerequisites were not established, it misstated the applicable criteria. Willis thus argues the trial court committed reversible error by applying "the wrong standards." Second, notwithstanding the Settlement provisions, Willis claims it was entitled to an award of fees and costs under section 1021.5.

The PWS argue the trial court properly denied the fees motion based on the relevant Settlement provisions. Nearly 18 pages of the respondents' brief are devoted to explaining why the prerequisite conditions did not exist, but the PWS do not address the

trial court's inaccurate paraphrasing of those conditions. The PWS further contend Willis did not satisfy the requirements of section 1021.5.

As we now explain, the fees motion was barred by the terms of the Settlement because the prerequisites for such a motion were not established. The trial court's ruling to that effect is supported by its other findings and conclusions, so any error in misdescribing the prerequisites was harmless. Given the preclusive effect of the Settlement, it is unnecessary to consider whether Willis could have satisfied the requirements of section 1021.5 had Willis otherwise been able to seek an award of post-Settlement fees and costs.[4]

## I.    Standard of Review

A trial court's ruling on a motion for attorney fees, whether based on a contractual agreement or pursuant to section 1021.5, is generally reviewed for abuse of discretion. (See *DisputeSuite.com, LLC v. Scoreinc.com* (2017) 2 Cal.5th 968, 973; *Serrano v. Stefan Merli Plastering Co., Inc.*, *supra*, 52 Cal.4th at pp. 1025–1026.) However, as the parties recognize, the issues before us are partially subject to de novo review. "In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.'" (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.)

"Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) If the trial court's

---

[4]On April 19, 2021, the Willis Class filed a request for judicial notice of materials it contends are supportive of its section 1021.5 arguments. Since the appeal is being resolved on other grounds, the request for judicial notice is denied. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [reviewing court may decline to take judicial notice of items not relevant to a material issue in the appeal].)

determination is predominately factual, we apply the substantial evidence test. (*Ibid.*; see *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 ["[I]f factual questions predominate, [the circumstances] may warrant a deferential standard of review"].) "If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank*, at p. 888.)

The language in a contract or a judgment is interpreted de novo. (See *Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1161; *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205 ["'The interpretation of the effect of a judgment is a question of law within the ambit of the appellate court'"].)

## II. Law of the Case Doctrine

"'The law of the case doctrine states that when, in deciding an appeal, an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal …."'" (*People v. Alexander* (2010) 49 Cal.4th 846, 870.) The doctrine applies to both civil and criminal matters. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 668; *Barrett v. Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593, 1603.)

An issue raised in *Antelope Valley III* was whether the Physical Solution is consistent with the 2011 Settlement. Willis made the following arguments in its briefing on appeal:

> "[They are not consistent because] the 2015 Judgment and Physical Solution (1) allocates no portion of the native supply to the Willis Class landowners; (2) requires Willis Class members to seek and (if even possible) obtain approval from the Watermaster (with interests starkly adverse to the Willis Class) to pump *any* groundwater only after enduring a burdensome and expensive discretionary process; (3) even if such approval is granted, it restricts all pumping to imported replacement water, rather than from the native supply, for which a replacement assessment must be

20.

paid, perhaps even for simple domestic use of water; (4) precludes the Willis Class from rights to the return flow resulting from the imported water they are required to purchase; (5) provides no portion of any unused Federal Reserve Water Right for the Willis Class, instead allocating all such unused water to the non-overlying [PWS]; and (6) allocates to the [PWS] a far greater portion of native supply than the agreed-upon 15 percent."

In *Antelope Valley III*, we concluded "the Physical Solution does not violate California water law principles and is consistent with the Settlement." (*Antelope Valley III*, *supra*, 62 Cal.App.5th at p. 1002; see *id.* at pp. 1021–1022.) We specifically addressed and rejected Willis's arguments to the contrary. (*Id.* at pp. 1043–1048.) Therefore, our resolution of the issue has become the law of the case. (See *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 ["The rule of 'law of the case' generally precludes multiple appellate review of the same issue in a single case"].)

In the present matter, Willis asserts the same arguments regarding the alleged inconsistencies between the Settlement and the Judgment. We quote from Willis's opening brief in this appeal:

> "The Physical Solution was inconsistent with the 2011 [Settlement] because (1) it allocated no portion of the native supply to the Willis Class landowners; ([citations])[;] (2) required Willis Class members to seek and (if even possible) obtain approval from the Watermaster (with interests starkly adverse to the Willis Class) to pump any groundwater only after enduring a burdensome and expensive discretionary process ([citations]); (3) even if such approval was granted, it restricted all pumping to imported replacement water, rather than from the native supply, for which a replacement assessment must be paid, perhaps even for simple domestic use of water ([citation]); (4) precluded the Willis Class from rights to the return flow resulting from the imported water they were required to purchase ([citations]); and, (5) provided no portion of any unused Federal Reserve Water Right for the Willis Class, instead allocating all such unused water to the non-overlying [PWS], resulting in a far greater portion of native supply than the agreed-upon 15%."

Under the law of the case doctrine, Willis's arguments based on the alleged inconsistencies between the Settlement and the Judgment necessarily fail. Insofar as our

21.

prior determination could be construed as upholding a factual finding by the trial court, "[a]n appellate court's decision on the sufficiency of evidence comes clearly within the doctrine." (*Wells v. Lloyd* (1942) 21 Cal.2d 452, 455.) In any event, were we able to consider the question anew, our analysis and conclusion would be the same.

## III. The Settlement Precluded Willis From Seeking Postsettlement Fees and Costs

Statutorily recoverable fees and costs may be "properly awarded after entry of a stipulated judgment, *unless expressly or by necessary implication excluded by the stipulation*." (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 678, italics added.) The parties in *Folsom* reached a settlement agreement that was silent as to costs and attorney fees. The plaintiffs later filed a cost bill and a motion for attorney fees under section 1021.5. (*Folsom*, at pp. 671, 675.) The main issue on appeal was whether the settlement effectively deprived the trial court of jurisdiction to award costs and statutory attorney fees. (*Id*. at p. 671.) Because the parties' agreement "included no provision as to costs or statutory fees, [it] did not deprive the trial court of jurisdiction." (*Id*. at p. 680.) Had the agreement reflected plaintiffs' intent to waive any recovery of fees and costs, the waiver provision would have been enforceable. (See *id*. at pp. 678–679; *Zambrano v. Oakland Unified School Dist*. (1991) 229 Cal.App.3d 802, 805 ["Absent 'affirmative agreement of the parties to the contrary,' the trial court retains jurisdiction after the filing of a compromise agreement to consider a statutory fee motion"].)

Willis expressly and affirmatively pledged "that they [would] not seek any attorneys' fees and/or costs from [the PWS] for any efforts Willis Class Counsel under[took] after the Court's entry of Final Judgment approving the Settlement, except with respect to the following …." The Settlement lists five qualifying circumstances, but Willis acknowledges "[t]he last two of these [lettered] criteria are inapplicable." The relevant provisions are as follows:

22.

"(a) any reasonable and appropriate efforts by Willis Class Counsel to enforce the terms of [the Settlement] against [the PWS] in the event [the PWS] fail to comply with a provision of [the Settlement]";

"(b) any reasonable and appropriate efforts by Willis Class Counsel to defend against any new or additional claims or causes of action asserted by [the PWS] against the Willis Class in pleadings or motions filed in the [AVGC]";

"(c) any reasonable and appropriate efforts by Willis Class Counsel that are undertaken in response to a written Court order stating that, pursuant to this provision, [Willis] Class counsel may seek additional fees for specified efforts from [the PWS] pursuant to Code of Civil Procedure section 1021.5."

The trial court's order denying the fees motion states, "It was expressly agreed in the [Settlement] that [Willis] would not seek further fees and costs except in very narrow circumstances as described below." Elsewhere in the order, the trial court said, "[B]y the terms of the [Settlement], [Willis] agreed not to seek further fees and or costs from the PWS except under three very specific circumstances as specified in Paragraph VIIID of the [Settlement], none of which are applicable here:

"a) If counsel was ordered to participate in the proceedings;

"b) If counsel engaged in reasonable efforts to defend against new claims or causes of action made against the class;

"c) Enforcement of a public right under [section] 1021.5."

The trial court's paraphrasing of the conditions was plainly inaccurate. However, the misstatements do not necessarily demonstrate reversible error. "There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269.) "A trial court's order is affirmed if correct on any theory, even if the trial court's reasoning was not correct." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15–16.)

23.

Willis cites multiple cases for the principle that a trial court errs by failing to apply the correct standards governing an issue under its consideration. (E.g., *569 E. County Boulevard LLC v. Backcountry Against the Dump, Inc*. (2016) 6 Cal.App.5th 426, 434; *Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1272.) On the question of whether reversal for such error is mandatory, Willis relies on *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629 (*Flannery*). The *Flannery* case involved an award of attorney fees under section 1021.5. The opinion says, "[R]eversal is required where there is no reasonable basis for the ruling or when the trial court has applied the wrong test to determine if the statutory requirements were satisfied." (*Flannery*, at p. 634.)

Assuming, arguendo, *Flannery* correctly states the law in the specific context of section 1021.5, a broader rule of mandatory reversal does not exist. (See, e.g., *California Teachers Assn. v. Governing Board* (1977) 70 Cal.App.3d 833, 845; cf. *Boctor v. Los Angeles County Metropolitan Transit Authority* (1996) 48 Cal.App.4th 560, 572–573 [trial court's erroneous misstatement of applicable standard held harmless].) "No judgment, decision, or decree shall be reversed or affected by reason of any error … unless it shall appear from the record that such error … was prejudicial." (Code Civ. Proc., § 475; accord, Cal. Const., art. VI, § 13.) Also, *Flannery* is distinguishable because here the trial court did not apply "the wrong test" to determine if "statutory requirements" were satisfied. (*Flannery*, *supra*, 61 Cal.App.4th at p. 634.) The alleged error was in determining the applicability of provisions in a settlement agreement (which had been incorporated into a judgment).

In *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, the appellate court upheld the denial of an application to terminate a domestic violence restraining order. There were questions as to whether the trial court had applied the correct standards governing the request. The opinion states, in relevant part: "[T]o the extent the trial court erred in applying the wrong standard, that error is harmless because in the course of its statement

24.

of decision, the trial court made factual findings that we are able to apply to the [controlling] standard … to determine that, had the trial court applied the correct standard, it would have reached the same result." (*Id*. at p. 1504, fn. 11.) We employ the same reasoning here, especially given Willis's prejudice argument. (See Code Civ. Proc., § 475; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107 [explaining Cal. Const. "expressly preclude[s] reversal absent prejudice"].)

Willis argues: "If the trial court had properly applied criteria (a) of the [attorney fees clause] in evaluating the fee petition, the Willis Class would have prevailed in seeking its fees and costs." This argument is entirely dependent upon Willis's claim that the Settlement and the Judgment are inconsistent. Condition "(a)" of the Settlement's attorney fees clause required "reasonable and appropriate efforts" by Willis to enforce the terms of the Settlement "in the event [the PWS] fail[ed] to comply with a provision of [the Settlement]." Willis's theory of breach is that the PWS's support of the Physical Solution "amounted to a reneging of the material terms of the [Settlement]" because the Settlement and the terms of the Physical Solution are in conflict.

Prior to the filing of Willis's fees motion, the trial court ruled "that the Physical Solution is consistent with the [Settlement]." Accordingly, in its order denying the fees motion, the trial court found Willis's post-Settlement participation in the AVGC "was neither mandatory nor appropriate beyond ensuring that [the Settlement] would be incorporated into the final judgment"; Willis's opposition to the Physical Solution was "misplaced"; and "[t]here was no legal adversity between the Willis Class and the PWS after the judgment [on their settlement agreement] was entered in 2011." Therefore, even assuming the trial court used the "wrong standards" to determine the effect of the attorney fees clause, there is no possibility it would have ruled differently had it properly considered the requirements of condition "(a)." (See Code Civ. Proc., § 475.) Moreover, it could not now reach a different conclusion because our decision in *Antelope Valley III* has become the law of the case.

The trial court did not misconstrue condition "(b)" of the attorney fees clause, i.e., "reasonable and appropriate efforts by Willis … to defend against any new or additional claims or causes of action asserted by [the PWS] against the Willis Class in pleadings or motions filed in the [AVGC]." The trial court found "no party ever … made any attempt to modify the [Settlement]," and "[t]here were no new claims or causes of action which would require the defense by [Willis's] class counsel." Accordingly, the order on the fees motion states condition "(b)" is not applicable.

Willis argues "[t]he Physical Solution was in effect a motion asserting new claims against the Willis Class as it modified the Willis Class' right to pump from the native supply." This contention and the other arguments made regarding condition "(b)" are all derivative of the claim the Settlement and Physical Solution are inconsistent. Since the dispositive issue of consistency has been resolved against Willis, the trial court did not err in finding condition "(b)" was never established.

The remaining and most specific qualifying circumstance was condition "(c)," which required "a written Court order stating that, pursuant to this provision, [Willis] may seek additional fees for specified efforts from [the PWS] pursuant to Code of Civil Procedure section 1021.5." It is beyond dispute that such an order was never issued. Willis filed a "Motion to Obtain a Court Order for Permission to Seek Additional Attorneys' Fees," citing condition "(c)" as the basis for its request, and the motion was denied.

Willis's arguments regarding condition "(c)" are based on the trial court's misdescription of the requirement in terms of whether "counsel was ordered to participate in the proceedings." In relation to the misstated criteria, the trial court found it had "not require[d] an appearance by [Willis] in any phase of the trial after the [Settlement] in 2011." Willis strenuously argues it was "ordered to participate in Phase Six" pursuant to the 2014 CMO and by virtue of other events and circumstances. The arguments are both unpersuasive and misguided.

26.

By Willis's own admission, the conditions in the Settlement's attorney fees clause are "precise and carefully crafted" and the "product of careful and protracted negotiations." Assuming Willis could show it was compelled to participate in post-Settlement proceedings, an order expressly or impliedly requiring its participation is not the same thing as "a written Court order *stating that*, *pursuant to this provision* [i.e., § VIII(D)(c) of the Settlement], [Willis] *may seek additional fees* for *specified efforts* from [the PWS] *pursuant to Code of Civil Procedure section 1021.5*." (Italics added.) Further assuming the trial court did not simply misstate condition "(c)" and instead failed to consider its applicability, prejudice is lacking because the required court order was never made. In other words, the trial court could not have ruled in Willis's favor on this issue. Therefore, it cannot be said "that a different result would have been probable if [the alleged] error … had not occurred or existed." (Code Civ. Proc., § 475.)

In an apparent effort to sidestep the attorney fees clause, Willis's opening brief states: "Independent of the 2011 [Settlement], Class counsel was entitled to an award of attorneys' fees and costs under Section 1021.5." No explanation is provided regarding how Willis could seek fees and costs from the PWS without establishing the prerequisite conditions of the Settlement. In the reply brief, Willis argues for the first time that "the [PWS] and the trial court essentially waived the need to obtain 'a written Court order [as specified in condition (c) of the Settlement's attorney fee clause].'" The argument has been forfeited. (See *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 171 ["When new arguments are raised in the reply brief, to which respondent has no opportunity to respond, we are not required to consider them"]; accord, *California Building Industry Assn. v. State Water Resources Control Bd*. (2018) 4 Cal.5th 1032, 1050.)

Forfeiture aside, the waiver argument is without merit. "Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.'" (*Lynch v. California Coastal Com*. (2017) 3 Cal.5th 470, 475.) "The intention may be express, based on the waiving party's words, or

27.

implied, based on conduct that is "'so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."'" (*Ibid.*)

Willis argues it "attempted to comply with sub-section c by filing a Motion to Obtain Court Order Permitting Willis Class Counsel to Seek Additional Attorneys' Fees [record citation] but the trial court misunderstood the import of subpart c and instead instructed Class counsel to come back to seek fees under Section 1021.5. [Record citations]." However, there are no contingencies or excusals in the Settlement for the trial court's misunderstanding of the provisions therein. The trial court's alleged misunderstanding of condition "(c)" is not an affirmative waiver or the functional equivalent of a waiver. Furthermore, the record citations do not substantiate the allegation the trial court "instructed Class counsel to come back to seek fees under Section 1021.5."

Willis further contends, "even [the PWS] argued the motion was premature." In fact, the PWS opposed the "Motion to Obtain a Court Order for Permission to Seek Additional Attorneys' Fees" on grounds it was inappropriate and prohibited by the terms of the Settlement. In their opposition papers, the PWS argued, "Willis Class' request is inappropriate and contravenes the letter and spirit of [condition (c)]." Willis relies on a remark made by opposing counsel when the motion was heard: "I don't particularly want to stand here and educate counsel on this issue, but I can safely say that this is not the time or place to get a pre-authorization." We conclude any characterization of the motion as premature in this context was not an express or implied waiver of the specific requirements of condition "(c)."

In summary, Willis was bound by its agreement to not seek post-Settlement attorney fees and costs except under certain conditions. None of the conditions were established. Therefore, the fees motion was properly denied.

## IV.   Arguments re:  Other Landowners

At oral argument, appellate counsel alleged the Willis Class established grounds to recover fees pursuant to section 1021.5 from unspecified overlying landowners.  This claim was not asserted or developed in the appellate briefing.  Therefore, it has been forfeited and will not be considered.  (See *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 ["The appellant may not simply incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on appeal"]; *Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 455 ["Ordinarily, an argument not raised in the opening brief is forfeited on appeal"].)

The trial court's motion ruling states, "The only parties against whom the court could award fees and or costs to the Willis Class are the PWS …."  Willis's opening brief quotes extensively from the ruling but notably omits this statement.  Willis does not directly address or attempt to refute the trial court's conclusion, which would explain why no parties other than the PWS filed a respondent's brief in this appeal.  Issues not addressed in the opening brief include how other landowners qualified as "opposing parties" under section 1021.5 and how Willis could be deemed a successful party in relation to those landowners.  (See *Nestande v. Watson* (2003) 111 Cal.App.4th 232, 241 ["an 'opposing party' within the meaning of section 1021.5 is a losing party"].)  As between Willis and the other landowners, the only adversity alleged by Willis concerned the trial court's adoption of the proposed Judgment and Physical Solution—which Willis unsuccessfully opposed.

At page 68 of the opening brief, Willis briefly responds to the trial court's observation that, "The overlying owners were not an adverse party to the claims of the Willis Class …."  If the remarks on page 68 pertain to an argument for fees against other landowners, the claim is insufficiently developed.  (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 ["We discuss those arguments that are sufficiently developed to be cognizable.  To the extent [appellant] perfunctorily asserts other claims, without

29.

development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims"].)

## DISPOSITION

The portion of the trial court's order issued on April 25, 2016, denying appellants' Second Supplemental Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Represent[a]tive Incentive Award is affirmed. All parties are to bear their own costs on appeal.


PEÑA, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.